# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT WILLIAMS (#N03588), ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 15 C 8135 |
| v. ) | |
| ) | |
| DR. JONAHTAN KELLY and WEXFORD ) | |
| HEALTH SERVICES, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 10, 2016, Plaintiff Robert Williams, by counsel, brought a one-count First Amended Complaint against Defendants Dr. Jonathan Kelly ("Dr. Kelly") and Wexford Health Source, Inc. ("Wexford") alleging deprivations of his Eighth Amendment rights in relation to his medical care while he was incarcerated at Stateville Correctional Center ("Stateville"), which is part of the Illinois Department of Corrections ("IDOC"). *See* 42 U.S.C. § 1983. Before the Court is Defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants Defendants' motion for summary judgment.

## BACKGROUND

**I.     Introduction**

Williams, who is 56-years-old, is currently incarcerated at Pontiac Correctional Center ("Pontiac"), although during the relevant time period, he was incarcerated at Stateville. (R. 69, Defs.' Rule 56.1 Stmt. Facts ¶ 3; R. 74, Pl.'s Rule 56.1 Stmt. Facts ¶ 1.) Defendant Wexford employed Dr. Kelly as a Stateville correctional psychiatrist from 2011 through August 2016.

(Defs.' Stmt. Facts ¶¶ 4, 5; Pl.'s Stmt. Facts ¶ 4.) Williams alleges that at least eleven IDOC mental health care providers prescribed him Risperdal (Risperidone), but none of them advised him of certain potential side effects of the medication until March 2014. (Defs.' Stmt. Facts ¶ 7.) Risperdal is an antipsychotic drug and Williams' IDOC mental health care providers prescribed Risperdal to treat his schizophrenia and bipolar disorder. (Pl.'s Stmt. Facts ¶¶ 5, 14; Defs.' Stmt. Facts ¶ 8.) In this lawsuit, Williams asserts that he has developed gynecomastia as a result of taking Risperdal. (Defs.' Stmt. Facts ¶ 9.) In general, gynecomastia is increased breast tissue, that can be painful, and Risperdal's side effects include both glandular gynecomastia and pseudo-gynecomostia. (Pl.'s Stmt. Facts ¶ 19; Defs.' Stmt. Facts ¶ 33.)

## II. Williams' Treatment at Stateville

On December 19, 2012 – after Williams was transferred from Menard Correctional Center to Stateville – he had his initial visit with Dr. Kelly. (Defs.' Stmt. Facts ¶ 25.) At that time, Dr. Kelly documented that Williams was under the care of Dr. Kartan at Menard prior to his transfer and that Williams was taking Risperdal. (*Id.* ¶ 26.) Dr. Kelly continued to prescribe Williams Risperdal after this initial visit. (Pl.'s Stmt. Facts ¶ 17.) Also on December 19, 2012, Williams signed a form entitled "Mental Treatment Plan" in which he accepted the medical plan. (Defs.' Stmt. Facts ¶ 27.) Williams denies that Dr. Kelly informed him that gynecomastia is a potential side effect of taking Risperdal. (Pl.'s Stmt. Facts ¶ 33.) Dr. Kelly testified that it was his standard procedure to orally inform patients of common potential risks and side effects when prescribing medications. (*Id.* ¶ 20.) Also, Dr. Kelly testified that he began informing patients about gynecomastia as a potential side effect of Risperdal once the connection was supported by outside studies, which was around 2006. (*Id.* ¶ 24; R. 69-2, Kelly Dep., at 99.)

On March 5, 2014, when Dr. Kelly asked Williams about his medications' side effects, Williams showed Dr. Kelly his swollen breasts. (*Id*. ¶ 31; Pl.'s Stmt. Facts ¶ 26.) After Dr. Kelly observed Williams' gynecomastia on that date, he discontinued prescribing Williams Risperdal, and instead prescribed Depakote. (Defs.' Stmt. Facts ¶ 30; Pl.'s Stmt. Facts ¶¶ 27, 28.) Dr. Kelly's response to Williams' concerns about his increased breast tissue was to discontinue Risperdal and monitor for changes. (Defs.' Stmt. Facts ¶ 35.)[1] It is undisputed that the only time Williams mentioned his swollen breasts to Dr. Kelly was on March 5, 2014. (*Id*. ¶ 31.) Prior to March 2014, various Stateville medical personnel asked Williams if he was experiencing any side effects from his medications, to which he answered no. (*Id*. ¶ 29.) IDOC transferred Williams to Pontiac in April 2015. (Pl.'s Stmt. Facts ¶ 2.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary

---

[1] Williams' contention that thereafter Dr. Kelly "inexplicably refused to see him for treatment" is not supported by the record. (R. 69-2, Kelly Dep., at 64-65.)

judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). If the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citation omitted).

## ANALYSIS

**I.     Exhaustion**

Defendants first argue that Williams has failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(a). The "benefits of exhaustion … include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) ("Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."). Failure to exhaust under the PLRA is an affirmative defense that Defendants must prove, *see Davis v. Mason,* 881 F.3d 982, 985 (7th Cir. 2018), and "[u]nexhausted claims are procedurally barred from consideration." *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016); *see also Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). "The PLRA does not, however, demand the impossible," and thus, "[r]emedies that are genuinely unavailable or nonexistent need not be exhausted." *Pyles,* 829 F.3d at 864; *see also Weiss v. Barribeau*, 853 F.3d 873, 875 (7th Cir.

2017) ("Obviously prisoners can't be required to exhaust remedies that are unavailable to them[.]").

Each state sets its own prison grievance system, *see Jones*, 549 U.S. at 218, and "[a] prisoner must comply with the specific procedures and deadlines established by the prison's policy." *King v. McCarthy*, 781 F.3d 889, 893 (7th Cir. 2015). "Illinois has created a three-stage process for its inmates." *Pyles,* 829 F.3d at 864; *see also* 20 Ill. Admin. Code § 504.800, *et seq*. "Step one requires the inmate to attempt to resolve the problem through his or her counselor." *Pyles,* 829 F.3d at 864. "If that does not resolve the problem, the inmate must invoke step two, which involves the filing of a written grievance with a grievance officer … within 60 days after discovery of the problem." *Id.*; *see also Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014) ("a grievance shall be filed within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance."). If the grievance officer denies the grievance and the chief administrative officer (usually the warden) affirms the denial, the inmate may then appeal the decision to the Illinois Administrative Review Board ("ARB"), which is an entity within IDOC that has statewide jurisdiction. *See Pyles*, 829 F.3d at 864.

Alternatively, when an inmate believes he is raising an emergency issue, he may bypass the counselor and grievance officer and submit his grievance directly to the chief administrative officer. *See* 20 Ill. Admin. Code § 504.840; *Roberts*, 745 F.3d at 236. If the chief administrative officer agrees that the grievance relates to an emergency, namely, an issue presenting "a substantial risk of serious personal injury or other serious irreparable harm to the offender," *see Roberts,* 745 F.3d at 236, prison staff will then expedite the grievance process. If the chief administrative officer concludes that the grievance does not present an emergency, the inmate

5

may then appeal that denial to the ARB on an expedited basis. *See id.* at 235; 20 Ill. Admin. Code § 504.850(f).

Viewing the evidence and all reasonable inferences in Williams' favor – which the Court is required to do at this procedural posture – Williams filed two grievances concerning Risperdal's side effects, including an emergency grievance to the warden on March 31, 2014. (Pl.'s Stmt. Facts ¶ 56; Defs.' Stmt. Facts ¶ 12.) In his March 2014 emergency grievance, Williams stated that he would not have taken Risperdal had he been informed that swollen breasts were a possible side effect. (Pl.'s Stmt. Facts ¶ 57.) The warden returned this grievance as a non-emergency, and Williams appealed that determination. (*Id.* ¶ 58.) Nonetheless, the document Williams got in response to his non-emergency grievance had boiler-plate language directing him to file his grievance "in the normal manner." (*Id.* ¶ 59.) On August 1, 2014, Williams sent another emergency grievance to the warden based on Dr. Kelly's alleged failure to inform him that swollen breasts were a possible side effect of Risperdal. (*Id.* ¶ 60.) The warden returned the August 2014 grievance as a non-emergency, after which Williams appealed. (*Id.* ¶ 62.) Again, the form document Williams received in response to his non-emergency grievance directed him to file his grievance "in the normal manner." (*Id.*)

Because Williams did not file his grievance "in the normal manner" as stated on IDOC Form 0046, Defendants argue that he has failed to properly exhaust his administrative remedies. Despite the language on this form, the Illinois Administrative Code does not require that an inmate must resubmit his emergency grievance "in the normal manner." As the Seventh Circuit explains, "an inmate who seeks emergency review under § 504.840 has no obligation to resubmit the grievance through normal channels, even if the warden concluded that expedited review was unnecessary." *Glick v. Walker*, 385 Fed. Appx. 579, 583 (7th Cir. 2010). In other words,

"[t]here is nothing in the current regulatory text, however, that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." *Thornton v. Snyder,* 428 F.3d 690, 694 (7th Cir. 2005); *see also Muhammad v. McAdory*, 214 Fed. Appx. 610, 612-13 (7th Cir. 2007) ("we have held that an inmate who has requested that prison officials handle a grievance on an emergency basis" is "not required to resubmit that grievance through the standard procedure after the warden – the official responsible for acting on emergency grievances – concludes that the grieved condition is not an emergency."); *Quigley v. Hardy*, No. 11 C 9279, 2013 WL 5781737, at *3 (N.D. Ill. Oct. 24, 2013) ("The regulatory text to which the Seventh Circuit referred in *Thornton* exists to this day; it has not been changed in any way that would require an inmate in Quigley's position to start the grievance process over from scratch."). Simply put, "[a]lthough the grievance form directed inmates to submit a regular grievance if no emergency had been substantiated, the governing regulations themselves do not dictate such a requirement." *Dixon v. Schaefer,* No. 11 C 6860, 2013 WL 941971, at *3 (N.D. Ill. Mar. 11, 2013). As such, Williams was not obligated to follow grievance procedures that the Illinois Administrative Code does not require. *See Muhammad,* 214 Fed. Appx. at 623 ("prison administrators may not frustrate an inmate's efforts to comply with the administrative review process by imposing hurdles that are not part of the established grievance procedure."). Thus, under the circumstances, Defendants have not met their burden of demonstrating that Williams failed to exhaust his administrative remedies.

## II. Eighth Amendment Claim Against Dr. Kelly

The Court now turns to Williams' Eighth Amendment medical care claim focusing on the deliberate indifference subjective component because it is dispositive. "Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with

7

deliberate indifference to the serious medical needs of prisoners." *Cesal v. Moats*, 851 F.3d 714, 720-21 (7th Cir. 2017) (citing *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Eighth Amendment deliberate indifference claims contain both an objective and a subjective component, namely, the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017). "Objectively serious medical needs are those that have either been diagnosed by a physician and demand treatment, or are 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Cesal*, 851 F.3d at 721 (citation omitted). "Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety." *Rasho*, 856 F.3d at 476.

In this lawsuit, Williams contends that Dr. Kelly was deliberately indifferent to his serious medical needs because he failed to warn him that gynecomastia was a possible side effect of Risperdal. The Seventh Circuit has acknowledged that "[s]ome circuits have held that '[p]risoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment.'" *Phillips v. Wexford Health Sources, Inc.*, 522 Fed. Appx. 364, 367 (7th Cir. 2013) (quoting *White v. Napoleon,* 897 F.2d 103, 113 (3d Cir. 1990); citing *Pabon v. Wright,* 459 F.3d 241, 250 (2d Cir. 2006)). The relevant discussions in *Pabon* and *White* concern Fourteenth Amendment substantive due process claims based on the inmates' liberty interest to refuse medical treatment. *See White*, 897 F.2d at 113 ("the doctor must consider a prisoner's reasonable need to make an informed decision to accept or reject treatment, as well as his need to know any viable alternatives that can be made available in

8

prison."); *Pabon,* 459 F.3d at 241 ("We agree with the Third Circuit that an individual cannot exercise his established right to refuse medical treatment in a meaningful and intelligent fashion unless he has sufficient information about proposed treatment."); *see also Cruzan v. Director of Missouri Dept. of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) ("a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 78 (1990) (inmates possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."). Indeed, in another unpublished decision citing *White* and *Pablon*, the Seventh Circuit stated:

> Although we do not decide in this case whether to join or part ways with them, some circuits recognize that even absent a medical injury, as a matter of the substantive component of due process "[p]risoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment."

*Cox v. Brubaker*, 558 Fed. Appx. 677, 678 (7th Cir. 2014) (citations omitted).

Turning back to the *Phillips* decision – which involved an Eighth Amendment deliberate indifference medical care claim – the Seventh Circuit elucidated that "[a]lthough we have not had occasion to comment on this precise standard, we have adopted a general rule that is consistent with these circuits: The Eighth Amendment protects inmates from deliberate indifference to *substantial* risks of serious damage to their health." *Phillips,* 522 Fed. Appx. at 367 (citations omitted, emphasis in original). In other words, to survive Defendants' summary judgment motion, Williams must present sufficient evidence raising a triable issue of fact that Dr. Kelly actually knew about a substantial risk of serious harm to Williams' health or safety and nonetheless disregarded it. *See Farmer*, 511 U.S. at 837; *Rasho*, 856 F.3d at 476.

Here, it is undisputed that Dr. Kelly was unaware of Williams' swollen breasts (gynecomastia) until March 5, 2014, after which Dr. Kelly immediately took Williams off Risperdal and prescribed Depakote. Assuming Dr. Kelly did not warn Williams that gynecomastia was a side effect of Risperdal, in Illinois, a doctor "uses his medical judgment in deciding what information and warnings he or she will provide the patient." *Happel v. Wal-Mart Stores, Inc.,* 316 Ill. App. 3d 621, 626 (2d Dist. 2000), *aff'd,* 199 Ill. 2d 179 (2002). Specifically, under Illinois law, a doctor "decides which available drug best fits the patient's needs and chooses which facts from the various warnings should be conveyed to the patient, and the extent of disclosure is a matter of medical judgment[.]" *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 519 (1987).

It is well-settled that "the Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment," *Cesal*, 851 F.3d at 721, and that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Burgess v. Mar,* 395 Fed. Appx. 368, 368 (9th Cir. 2010) (failure to warn inmates of "the potential side effects of pain medicine constitute[s] negligence at most, and not deliberate indifference"); *Jetter v. Beard,* 130 Fed. Appx. 523, 526 (3d Cir. 2005) ("Dr. Roemer's alleged failure to inform Jetter of the side effects of Prednisone amounts to nothing more than negligence"). Instead, under the circumstances, Williams must present evidence creating a triable issue of fact that Dr. Kelly's course of treatment departed radically from "accepted professional practice" – which he has failed to do. *See Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016); *see also Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'") (citations omitted).

10

Williams' claim fares no better under the Fourteenth Amendment's substantive due process protections because there is nothing in record – viewed in Williams' favor – showing that Dr. Kelly withheld medical information for the purpose of inducing or compelling Williams to take Risperdal. *See Pabon,* 459 F.3d at 254; *Alston v. Bendheim,* 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009). If anything, Dr. Kelly's failure to inform Williams that gynecomastia was a potential side effect of Risperdal was inadvertent. *See Pabon,* 459 F.3d at 250 ("Inadvertent failures to impart medical information cannot form the basis of a constitutional violation"). Thus, the Court grants Defendants' summary judgment motion as to Williams' Eighth Amendment deliberate indifference claim against Dr. Kelly.

### III. Monell Claim Against Wexford

The Court now turns to Williams' *Monell* claim against Wexford. A private corporation that has contracted to provide essential government services, such as Defendant Wexford, may be held liable under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc). To recover under *Monell*, Williams must show that (1) he suffered a deprivation of a constitutional right; (2) as a result of an express policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that was; (3) the moving force behind his constitutional injury. *See id.* at 379; *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017). In regard to the third element, based on the Supreme Court's § 1983 municipal liability jurisprudence:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with

11

> the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of Cnty. Comm'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 404 (1997).

Although Williams has not established that Dr. Kelly was the moving force behind a constitutional deprivation, "*Monell* liability does not always require a finding of individual liability." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). To clarify, "if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Glisson,* 849 F.3d at 378. In his legal memorandum, Williams explains that his *Monell* claim is based on Wexford's lack of policy warning inmates about the potential side effects of medications. More specifically, Williams asserts that there is a "gap" in Wexford's express policies. *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) ("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies."). To establish his claim, Williams must set forth evidence creating a material issue of fact for trial that this gap in Wexford's policy was related to a constitutional deprivation because under *Monell*, "[t]he central question is always whether an official policy … caused the constitutional deprivation." *Glisson*, 849 F.3d at 379; *see also Swanigan v. City of Chicago*, 881 F.3d 577, 582 (7th Cir. 2018).

The duty to warn a patient of a prescription drug's side effects – standing alone – is a physician's professional duty under Illinois law. *See Xeniotis v. Cynthia Satko, D.D.S.*, 14 N.E.3d 1207, 1213 (1st Dist. 2014) ("In a malpractice action based on the doctrine of informed consent, the plaintiff must" show that "the physician had a duty to disclose material risks."); *McDonald v. Lipov,* 13 N.E.3d 179, 187 (2d Dist. 2014) ("It is well established that a claim that a health professional acted without the informed consent of the patient is a type of medical

malpractice claim."). Thus, under the circumstances – and construing the evidence in Williams' favor – that Wexford has gaps in its policies regarding warning inmates about medications' potential side effects does not implicate any constitutional deprivation.

Further, Williams argues that his *Monell* claim is attributable to Wexford's failure to properly train its medical staff. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). As the *Connick* Court explained, when a state actor's "policymakers are on actual or constructive notice that a particular omission in their training program causes [its] employees to violate citizens' constitutional rights, the [state actor] may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id*. at 61. More specifically, the "failure to provide adequate training to its employees may be a basis for imposing liability on a municipality or private corporation, but as with any other policy or practice for which the plaintiff seeks to hold the municipal or corporate defendant liable, the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012).

Here, Williams has not presented any evidence that Wexford's or IDOC's policymakers were aware of any training deficiencies. In addition, Williams has not presented sufficient evidence supporting a reasonable inference that the alleged training deficiency was the moving force behind a constitutional injury. *See Canton*, 489 U.S. at 391; *see also Design Basics, LLC v. Lexington Homes, Inc.,* 858 F.3d 1093, 1099 (7th Cir. 2017) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion") (citation omitted). The Court therefore grants Defendants' motion for summary judgment in relation to Williams' failure to train and policy *Monell* claims against Wexford.

## CONCLUSION

For these reasons, the Court grants Defendants' Rule 56(a) summary judgment motion.

**Dated:** April 23, 2018

                                       **ENTERED**

                                   _____
                                   **AMY J. ST. EVE**
                                   **United States District Court Judge**